FILED

2013 NOV 18  PM 2: 00

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2012 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>BRYAN D'ANTONIO,<br>   aka Brian D'Antonio,<br>   aka Brian Toney,<br>CHARLES WAYNE FARRIS,<br>   aka Wayne Farris, and<br>RONALD RODIS,<br><br>              Defendants. | SA CR No. **SACR13-0208**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to<br>Commit Wire Fraud; 18 U.S.C.<br>§ 1343: Wire Fraud; 18 U.S.C.<br>§ 401(3): Criminal Contempt] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this indictment:

1.   The Financial Group, Inc., ("TFG") was a California corporation.  TFG did business, at various times, as Rodis Law Group ("RLG") and America's Law Group ("ALG") (collectively "the company").

1

2.   From approximately November 2008 through approximately April 2009, RLG purported to offer loan modification assistance to struggling homeowners facing foreclosure.  RLG offered these services in exchange for a flat retainer fee.  Defendants BRYAN D'ANTONIO, also known as ("aka") "Brian D'Antonio," aka "Brian Toney" ("D'ANTONIO"), CHARLES WAYNE FARRIS, aka "Wayne Farris" ("FARRIS"), and RONALD RODIS and their co-conspirators falsely told potential clients that RLG could guarantee lower interest rates, reduced principal balances, specific monthly payment amounts, and a had 100% success rate.

3.   From April 2009 through June 8, 2009, ALG purported to offer loan modification assistance to struggling homeowners facing foreclosure.  ALG offered these services in exchange for a flat retainer fee.  Defendants D'ANTONIO, FARRIS, and RODIS and their co-conspirators falsely told potential clients that ALG could guarantee lower interest rates, reduced principal balances, specific monthly payment amounts, and a 100% success rate.

4.   Defendant D'ANTONIO owned, operated, and managed TFG, RLG, and ALG.  Defendant D'ANTONIO held the position of "CEO" at TFG and was also referred to at the company as the "Senior Managing Director" and "General Sales Manager" of RLG. Defendant D'ANTONIO was referred to as the "Senior Managing Director" of ALG.  Defendant D'ANTONIO was subject to a federal court order permanently banning him from engaging in any telemarketing activity.  The same court order also permanently banned defendant D'ANTONIO from misrepresenting any fact material to a consumer's decision to buy any good or service.

1  Additionally, at the time that defendant D'ANTONIO entered into
2  the conspiracy, defendant D'ANTONIO was on federal supervised
3  release in the Central District of California following his
4  convictions for mail and wire fraud.

5      5.   Defendant FARRIS operated and managed RLG and ALG.
6  Defendant FARRIS was referred to at the company as the "Managing
7  Director" of RLG and "Senior Managing Director" of ALG.

8      6.   Defendant RODIS was an attorney licensed to practice
9  law in the State of California.  Defendant RODIS was referred to
10 at the company as an "Owner" and "Senior Partner" of RLG.

11     7.   Defendants D'ANTONIO, FARRIS, and RODIS conducted the
12 business of TFG, RLG, and ALG in Orange County, California, and
13 elsewhere.

14 B.  OBJECT OF THE CONSPIRACY

15     8.   Beginning on an unknown date but at least as early as
16 in or around March 2008 and continuing until in or around June
17 2009, in Orange County, within the Central District of
18 California, and elsewhere, defendants D'ANTONIO, FARRIS, and
19 RODIS, together with others known and unknown to the Grand Jury,
20 knowingly combined, conspired, and agreed with each other to
21 commit wire fraud, in violation of Title 18, United States Code,
22 Section 1343.

23 C.  THE MANNER AND MEANS OF THE CONSPIRACY

24     The object of the conspiracy was to be carried out and
25 accomplished, in substance, as follows:

26     9.   Defendants D'ANTONIO, FARRIS, and RODIS, and other co-
27 conspirators, placed advertisements on radio stations
28 broadcasting nationwide.  These advertisements, which targeted

3

struggling homeowners who were facing foreclosure, promised loan modification assistance.   In an effort to induce homeowners to sign up for RLG's purported loan modification assistance, defendant RODIS falsely claimed in an advertisement that RLG employed a "team of experienced attorneys" who were "highly skilled in negotiating lower interest rates and even lowering your principal balance."   The advertisements instructed homeowners to call a toll-free number for further information.

10.   Upon calling the toll-free number, interested homeowners were transferred to "intake officers" who pitched RLG's and ALG's purported loan modification assistance.   During the pitches, the intake officers, who were tasked with selling struggling homeowners the purported loan modification assistance, followed scripts created by defendants D'ANTONIO and FARRIS, among others, that contained false statements, representations, and promises regarding RLG's and ALG's loan modification assistance.

11.   Following the scripts, the intake officers falsely told homeowners: "We routinely postpone trustee sales, lower monthly payments and even negotiate for a reduction in principal loan amounts."   The scripts also indicated: "All of our attorneys are licensed in Federal Court, so we will be able to represent you in any State."

12.   Acting at defendants D'ANTONIO and FARRIS' direction, intake officers also falsely and fraudulently told homeowners that RLG and ALG were "100% successful" in obtaining loan modifications from lenders.

13.  In an effort to further induce struggling homeowners to sign up for the purported loan modification assistance, defendant FARRIS and others developed form e-mails for intake officers to send to homeowners following the initial call that repeated many of the false statements, representations, and promises that were made over the telephone.  These e-mails falsely and fraudulently stated, among other things: "We typically lower interest rates, extend fixed rate terms, push any past due monies owed to the back of the loan, extend the total length of the term of the loan, and even lower principle [sic] balances on mortgages."

14.  Other scripts and e-mails falsely claimed that RLG and ALG would conduct "forensic audits" of the homeowner's mortgage and file lawsuits against lenders on the homeowner's behalf. Scripts and e-mails also falsely stated that RLG and ALG had "11 years of experience" and had been "re-writing mortgage contracts since 1996."

15.  To establish credibility for their scheme, capitalize on struggling homeowners' fear, and induce struggling homeowners to pay fees, defendants D'ANTONIO, FARRIS, and RODIS and their co-conspirators directed intake officers to falsely claim that RLG had a "qualifying committee" that screened potential clients and rejected approximately 25 percent of interested homeowners.

16.  Acting at the direction of defendants D'ANTONIO, FARRIS, and RODIS and their co-conspirators, intake officers also falsely told homeowners that RLG employees would conduct a "preliminary strategy session" to plan and successfully negotiate a loan modification.

5

17.   In order to further the scheme to defraud and to conceal their fraudulent activities, defendants D'ANTONIO, FARRIS, and RODIS, and other conspirators discussed ways to make RLG appear like a "traditional law office" and not a "call center."  Defendants D'ANTONIO, FARRIS, and RODIS discussed altering the physical appearance of the office, discussed the number of times potential "clients" should be contacted, and discussed changes to advertising and marketing, all in effort to prevent potential victims from learning that RLG was not a law firm.

18.   Based on the fraudulent representations and promises, RLG and ALG signed up struggling homeowners for purported loan modification assistance and charged a "retainer fee."  These fees varied based on the amount of the homeowner's mortgage, but typically started at $3,500.  Defendants D'ANTONIO, FARRIS, and RODIS took the struggling homeowners' payment by credit card, check, and electronic account withdrawals.  Payments could be divided into three monthly installments.

19.   Acting at defendants D'ANTONIO's, FARRIS', and RODIS' and their co-conspirators' direction, intake officers often recommended that homeowners skip mortgage payments in order to pay RLG's retainer fee.  The intake officers, acting at defendants D'ANTONIO's, FARRIS', and RODIS' direction, assured the struggling homeowners that RLG would save their homes from foreclosure if they paid money set aside for their mortgages to RLG instead of the lender.

20.   After defendants D'ANTONIO, FARRIS, and RODIS obtained the struggling homeowners' money, they e-mailed various

documents to the homeowner.   These documents included an "Initial Client Letter," "Designee Authorization/Power of Attorney," and "Retainer Agreement."   Homeowners were instructed to complete and sign these documents and to return them by fax or e-mail.   Intake officers also instructed homeowners to gather and fax financial records, such as tax returns, mortgage payment receipts, and proof of income to RLG and ALG.

21.   Homeowners who paid the "retainer fee" were assigned a "case manager" and "negotiator," who purportedly worked with defendant RODIS or another attorney to obtain a loan modification from the homeowner's lender.   RLG and ALG employees falsely told homeowners that a "team of attorneys" or a "team of paralegals" was assigned to their case.   RLG and ALG employees falsely told homeowners that defendant RODIS was personally handling their loan modification.

22.   Case managers and negotiators often contacted homeowners via e-mail or telephone for additional paperwork, including paperwork already collected by intake officers.   This paperwork was purportedly used to create a loan modification "package" that was to be submitted to the homeowner's lender for consideration.   Case managers and negotiators falsely told homeowners that RLG and ALG were "in negotiations" with lenders.

23.   Homeowners who retained RLG and ALG often called to speak to their assigned case manager or negotiator.   These homeowners were often unable to reach anyone.   To prevent homeowners from learning of the scheme to defraud, defendant FARRIS and others directed that all incoming homeowner calls be directed into a voice-mail system.   Homeowners who reached an

1  employee were falsely told that the homeowner's case manager or

2  negotiator was in a meeting or otherwise unavailable to speak

3  with the homeowner.

4      24.  Consumers filed complaints against RLG with the State

5  Bar of California, the Better Business Bureau, and other

6  agencies.  To further the scheme to defraud and prevent others

7  from learning of the scheme to defraud, defendants D'ANTONIO,

8  FARRIS, and RODIS and RLG and ALG employees threatened to sue

9  homeowners who filed complaints or posted negative reviews of

10  RLG's and ALG's services.

11      25.  To further the scheme to defraud and conceal defendant

12  D'ANTONIO's involvement in RLG's and ALG's operations because

13  defendant D'ANTONIO was subject to an Federal Trade Commission

14  ("FTC") injunction, had been convicted of mail fraud, and was on

15  federal supervised release, defendant RODIS, employee C.D.,

16  attorney N.C., and others were listed as owners and registered

17  agents on corporate documents for TFG, RLG, and ALG.

18      26.  During the course of the scheme to defraud, defendants

19  D'ANTONIO, FARRIS, and RODIS and their co-conspirators

20  fraudulently obtained more than $12,000,000 from struggling

21  homeowners.  Defendants D'ANTONIO, FARRIS, and RODIS split

22  proceeds from the fraudulent scheme amongst themselves.

23      27.  As early as February 2009, RLG employees discussed the

24  possibility of an FBI or FTC investigation.  Initially,

25  defendant RODIS demanded more money from defendant D'ANTONIO.

26  Later, defendant RODIS demanded that defendants D'ANTONIO and

27  FARRIS remove defendant RODIS' name from further operations of

28  RLG.  In response, defendants D'ANTONIO and FARRIS changed the

1  company's name to "America's Law Group" and recruited attorney
2  N.C. to serve as the "Senior Partner" of ALG.   In all other
3  respects, ALG operated identically to RLG.
4       28.   To fraudulently induce homeowners to hire RLG and ALG
5  to handle loan modifications, defendants D'ANTONIO, FARRIS, and
6  RODIS provided and made, and caused others to provide and make,
7  materially false statements and defendants D'ANTONIO, FARRIS,
8  and RODIS concealed and omitted to state, and caused others to
9  conceal and omit to state, material facts, including, among
10 others, the following:

Materially False Statements

12      a.   That RLG and ALG had been in business for 11
13 years, when in truth and in fact, both companies existed for
14 less than one year;
15      b.   That RLG and ALG were 100% successful in obtaining
16 loan modifications for clients, when in truth and in fact, only
17 a very small number of clients ever received a modification of
18 their loan;
19      c.   That RLG and ALG routinely obtained lower monthly
20 payments, reductions in principal balance, interest rates, and
21 often had late payments forgiven, when in truth and in fact,
22 these results were rarely achieved for any clients;
23      d.   That RLG and ALG were law firms and homeowners had
24 a team of attorneys and real estate professionals assigned to
25 their cases, when in truth and in fact, attorneys rarely
26 reviewed individual files and few RLG and ALG employees had
27 experience negotiating loan modifications.

9

Omission/Concealment of Material Facts

e.   That defendant RODIS did not typically handle negotiations with lenders for clients;

f.   That, in October 1999, the FTC filed a complaint against defendant D'ANTONIO alleging that defendant D'ANTONIO violated the law and made unsubstantiated claims in the sale of a work-at-home business opportunity;

g.   That, in July 2001, a federal judge entered an order prohibiting defendant D'ANTONIO and all persons or entities directly or indirectly under his control from engaging in telemarketing;

h.   That, in March 2003, defendant D'ANTONIO was convicted of one count of Mail Fraud, in violation of 18 U.S.C. § 1341 and one count of Wire Fraud, in violation of 18 U.S.C. § 1343.  These convictions resulted from defendant D'ANTONIO's participation in a telemarketing scheme;

i.   That defendants D'ANTONIO, FARRIS, RODIS, and others employed by RLG and ALG had received numerous complaints from homeowners about RLG's and ALG's inability to obtain loan modifications from lenders.

D.   OVERT ACTS

29.   In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants D'ANTONIO, FARRIS, and RODIS, together with other conspirators known and unknown to the Grand Jury, committed and caused others to commit the following overt acts, among others, on or about the following dates, within the Central District of California and elsewhere, including, but not limited to, the following:

1   OVERT ACT 1: On or about October 28, 2008, defendant
2   FARRIS, using the address cwf@taxreliefasap.com, sent an email
3   to defendants RODIS and D'ANTONIO and others instructing RLG
4   employees to say the following to homeowners who asked about
5   stopping mortgage payments:  "I can only advise you to do
6   whatever is in your own best interest.  If that's in your best
7   interest to do, then yes that's what you should do.  You should
8   also know that if you do that while we are negotiating for you,
9   there will be no foreclosure action against you."

10   OVERT ACT 2: On or about November 7, 2008, defendant RODIS,
11   using the address attorneyronrodis@yahoo.com, e-mailed defendant
12   D'ANTONIO at e-mail address bdd@taxreliefasap.com to discuss
13   "Particulars re: the Rodis Law Group."  Defendant RODIS wrote:
14   "My only concern is that from my research, in the legal
15   industry, law firms do not grow at such a rapid pace.  If we do
16   grow at an exponential rate, we will be under the microscopic
17   scrutiny of the State Bar.  In addition, since the DOJ has been
18   cracking down on loan mod companies (2 in Los Angeles and 1 in
19   OC) we should fly under the radar and direct attention away from
20   us."

21   OVERT ACT 3: On or about November 19, 2008, homeowner M.P.
22   called RLG and spoke with employee M.B.  During the telephone
23   call, M.B. followed a script and training provided by defendant
24   FARRIS.  M.B., following the script and training, told homeowner
25   M.P. that she could skip her mortgage payment to pay RLG's
26   "retainer fee."  M.B. said: "If you don't want to make your
27   payment, that's fine, I can protect you through the
28   negotiations...."

11

1    OVERT ACT 4: On or about November 30, 2008, defendant

2  RODIS, using the address attorneyronrodis@yahoo.com e-mailed

3  defendant D'ANTONIO at e-mail address bdd@taxreliefasap.com.

4  Defendant RODIS wrote: "This company has to have the look and

5  feel of a traditional law office and I can work with Wayne on

6  that aspect."  Later in the same e-mail, defendant RODIS wrote:

7  "The numbers we are making can support a monthly salary of $25k

8  for each of us and and [sic] another increase in the next few

9  months.  Then there is the issue of the use of my name and

10 reputation and the risk involved to me."

11   OVERT ACT 5: On or about December 1, 2008, defendant

12 D'ANTONIO, using the e-mail address bdd@taxreliefasap.com,

13 forwarded the e-mail in Overt Act 4 to defendant FARRIS at e-

14 mail address cwf@taxreliefasap.com.  In response, defendant

15 FARRIS wrote: "It doesn't seem to be something he realizes, but

16 if Ron weren't here, I'm sure we can find plenty of attorneys

17 who would like to hang their license here at reasonable

18 compensation, and sales would go forward unaffected."

19   OVERT ACT 6: On or about December 5, 2008, homeowner K.V.

20 called RLG and spoke with employee R.C.  During the telephone

21 call, R.C. used a script prepared by defendant FARRIS.  R.C.,

22 following the script, told homeowner K.V.: "We're actually 100

23 percent successful.  We've never had one instance where a lender

24 is not willing to work with us."

25   OVERT ACT 7: On or about December 18, 2008, defendant

26 D'ANTONIO, using the e-mail address bdd@taxreliefasap.com, e-

27 mailed RLG employee S.S. and defendant FARRIS.  In the e-mail,

28

1  defendant D'ANTONIO asked S.S. to create an "outbound
2  telemarketing schedule" to address missed calls.

3      OVERT ACT 8: On or about January 14, 2009, RLG charged
4  homeowner T.Y.'s Mastercard $3,500 for loan modification
5  services.

6      OVERT ACT 9: On or about January 15, 2009, defendant
7  D'ANTONIO told a meeting of various RLG employees: "We're here
8  to make money, not to help people.  We are here to make a
9  profit."

10      OVERT ACT 10: On or about February 5, 2009, RLG employee
11  M.L. e-mailed defendant FARRIS and other RLG employees regarding
12  "Missing Items in Files."  In the e-mail, M.L. wrote: "If a
13  client has been signed up with us for over 2 months, is it
14  really a good thing to tell that client that we have not even
15  contacted their lender!?...even if it is the truth?  They need
16  to understand that their job requires them to bend the truth
17  sometimes to make the client feel better."

18      OVERT ACT 11: On or about March 2, 2009, RLG employee K.A.,
19  using the address kja@rodislawgroup.com, e-mailed homeowner P.K.
20  using a scripted e-mail provided to the sales staff by defendant
21  FARRIS and others.  In the e-mail, K.A. wrote: "The bottom line
22  is we routinely rewrite mortgage contracts on behalf of our
23  clients."  Later, K.A. wrote: "If the bank we are negotiating
24  against doesn't want to do what we want to do for our client, we
25  always offer to haul them into court and in front of a judge; do
26  a forensic analysis of the loan documents, review the documents
27  for RESPA violations, TILA violations, GFE violations and
28  Predatory Lending Violations."

OVERT ACT 12: On or about March 19, 2009, RLG employee K.A., using the address kja@rodislawgroup.com, e-mailed homeowner P.K. to explain the steps to be accepted as a client at RLG.  K.A. wrote the "qualifying committee, made up of attorneys and paralegals, will review to make sure the case is winnable."  In the same e-mail, K.A. also wrote: "This is a process that needs to be taken because all the attorneys on staff are federally licensed and regulated by the Attorney General."

OVERT ACT 13: On or about March 25, 2009, RLG charged homeowner P.K.'s American Express card $5,500 for loan modification services.

OVERT ACT 14: On or about May 11, 2009, ALG supervisor R.O., using the address rxo@americaslawgroup.com e-mailed ALG employees R.C., C.H., J.W., J.P., and M.B. an updated version of the "Seven Things The Banks Do Not Want You To Know."  The "Seven Things" included, "As a Law Firm we routinely lower our client's mortgage interest rates" and "As a Law Firm we routinely lower our client's monthly payments."

COUNTS TWO THROUGH NINE

[18 U.S.C. § 1343]

A.   INTRODUCTORY ALLEGATIONS

30.  The Grand Jury re-alleges and incorporates herein by reference the Introductory Allegations of Count One of this indictment.

B.   THE FRAUDULENT SCHEME

31.  Beginning on an unknown date but at least as early as in or around March 2008 and continuing until in or around June 2009, in Orange County, within the Central District of California, and elsewhere, defendants D'ANTONIO, FARRIS, and RODIS, together with others known and unknown to the Grand Jury, knowingly and with intend to defraud, devised, participated in, and executed a scheme to defraud victims as to material matters, and to obtain money and property from victims by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

32.  The fraudulent scheme was carried out in the manner and means described at paragraphs nine through 29, which the Grand Jury hereby re-alleges and incorporates herein by reference as if fully set forth herein.

C.   THE USE OF THE WIRES

33.  To execute the above-described fraudulent scheme, on or about the below-specified dates, within the Central District of California, and elsewhere, defendants D'ANTONIO, FARRIS, and RODIS, while aiding and abetting each other, and together with others known and unknown to the Grand Jury, transmitted and

caused the transmission of the following items by means of wire

communication in interstate commerce:

| COUNT | DATE | DECRIPTION OF WIRE |
|---|---|---|
| TWO | 12/3/2008 | Telephone call between victim D.B. in Washington and RLG employee J.Y. in California |
| THREE | 1/14/2009 | Telephone call between victim T.Y. in Nevada and RLG employee J.L. in California |
| FOUR | 1/16/2009 | Telephone call between victim C.R. in North Carolina and RLG employee M.M. in California |
| FIVE | 1/2009 | Telephone call between victim B.A. in Utah and RLG employee A.D. in California |
| SIX | 2/04/2009 | E-mail from RLG employee R.M. in California to victim M.C. in Illinois |
| SEVEN | 3/19/2009 | E-mail from RLG employee K.A. in California to victim P.K. in Florida |
| EIGHT | 3/24/2009 | Telephone call between victim D.K. in Virginia and RLG employee V.K. in California |
| NINE | 3/24/2009 | Telephone call between victims R.H. and K.H. in Massachusetts and RLG employee C.S. in California |

COUNTS TEN AND ELEVEN

[18 U.S.C. § 401(3)]

A.   INTRODUCTORY ALLEGATIONS

34.   The Grand Jury re-alleges and incorporates herein by reference the Introductory Allegations, and the Manner and Means section of Count One of the indictment.

B.   THE 2001 COURT ORDER

35.   At all times relevant to this indictment, defendant BRYAN D'ANTONIO ("D'ANTONIO") was subject to the provisions of a Stipulated Final Judgment and Order for Permanent Injunction entered by the United States District Court for the Central District of California ("The 2001 Court Order").

36.   The 2001 Court Order was the result of an enforcement action brought by the Federal Trade Commission ("FTC") in FTC v. Data Medical Capital, Inc., 99-CV-1266-AHS against defendant D'ANTONIO, in which the FTC alleged defendant D'ANTONIO made material misrepresentations to consumers while promoting a work-at-home opportunity.

37.   On or about July 13, 2001, the United States District Court for the Central District of California entered the 2001 Court Order in the case.  Defendant D'ANTONIO signed the order and formally acknowledged receiving and agreeing to every provision of the 2001 Court Order.

38.   Section I of the 2001 Court Order prohibited defendant D'ANTONIO, whether acting "directly or through any corporation, limited liability company, subsidiary, division, or other device," from "engaging in or, receiving any remuneration of any kind whatsoever from, holding any ownership interest, share, or

stock in, or serving as an officer, director, trustee, general manager of, or consultant or advisor to, any business entity engaged in...(b) Telemarketing or assisting others engaged in telemarketing."

39. The 2001 Court Order defined "telemarketing" as "a plan, program or campaign which is conducted to induce the purchase of goods or services by the use of one or more telephones and which involves more than one interstate telephone call."

40. Section II of the 2001 Court Order prohibited defendant D'ANTONIO, and all persons or entities directly and indirectly under his control, from misrepresenting, expressly or by implication, any fact material to a consumer's decision to buy or accept a good or service.

41. On or about the dates specified below, defendant D'ANTONIO knowingly and willfully disobeyed and resisted a lawful order, decree, and command of the United States District Court for the Central District of California, namely, Section I of the 2001 Court Order, by engaging in, and receiving remuneration from, holding an ownership interest and share in, and serving as an officer, director, general manager of and consultant and advisor to the following business entities engaged in telemarketing:

| Count | Approximate Dates | Entity |
|---|---|---|
| TEN | 11/2008 through 6/2009 | Rodis Law Group |
| ELEVEN | 4/2009 through 6/2009 | America's Law Group |

18

COUNTS TWELVE THROUGH TWENTY-THREE

[18 U.S.C. § 401(3)]

42.  The Grand Jury hereby repeats and re-alleges Paragraphs 34 through 40 inclusive as if fully set forth herein.

43.  On or about the dates set forth below, defendant BRYAN D'ANTONIO ("D'ANTONIO") knowingly and willfully disobeyed and resisted a lawful order, decree, and command of the United States District Court for the Central District of California, namely, Section II of the 2001 Court Order, in that, directly and through a business entity and in connection with the advertising, marketing, promoting, and offering for sale of a service, defendant D'ANTONIO made and caused to be made false and misleading statements and representations of material fact, expressly and by implication, concerning a service, namely the Rodis Law Group loan modification service.  Specifically, defendant D'ANTONIO caused his agent and employee to provide false and misleading information to the victims on or about the dates set forth below:

| COUNT | DATE | VICTIM | MISREPRENTATION |
|---|---|---|---|
| TWELVE | 11/19/08 | M.P. of Rowland Heights, California | Likelihood of successful loan modification |
| THIRTEEN | 12/03/08 | D.B. of Spokane, Washington | Likelihood of successful loan modification |
| FOURTEEN | 12/23/08 | M.E. of North Hills, California | Likelihood of successful loan modification and specific actions RLG would take |
| FIFTEEN | 1/2009 | C.R. of Clayton, | Likelihood of successful loan |

| | | North Carolina | modification and RLG's experience modifying loans |
|---|---|---|---|
| SIXTEEN | 1/2009 | T.Y. of Fernley, Nevada | Likelihood of successful loan modification |
| SEVENTEEN | 1/05/09 | B.A. of Salt Lake City, Utah | Likelihood of successful loan modification and likelihood that an attorney would be assigned to his case |
| EIGHTEEN | 2/2009 | L.B. of Hidden Valley Lake, California | Likelihood of successful loan modification and RONALD RODIS' personal involvement in her case |
| NINETEEN | 2/2009 | B.D. of Mammoth Lakes, California | Likelihood of successful loan modification and identity of attorneys assigned to her case |
| TWENTY | 2/04/09 | M.C. of Plainfield, Illinois | Likelihood of successful loan modification |
| TWENTY-ONE | 3/24/09 | D.K. of Gainesville, Virginia | Likelihood of successful loan modification and likelihood than an attorney would be assigned to his case |
| TWENTY-TWO | 3/24/09 | R.H. and K.H. of Wareham, Massachusetts | Likelihood of successful loan modification |

| TWENTY-THREE | 3/2009 | P.K. of Pompano, Florida | Likelihood of successful loan modification and likelihood than an attorney would be assigned to his case |
|---|---|---|---|

A TRUE BILL

_____/S/_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

DENNISE D. WILLETT
Chief, Santa Ana Branch Office

JOSEPH T. McNALLY
Assistant United States Attorney
Deputy Chief, Santa Ana Branch Office

MICHAEL S. BLUME
Director, Consumer Protection Branch
Department of Justice

CHRISTOPHER E. PARISI
Trial Attorney, Consumer Protection Branch
Department of Justice